SAMUEL A. COEN, ADMINISTRATOR, APPELLEE, V. CENTRAL TELEPHONE COMPANY, APPELLANT.

FILED APRIL 17, 1914.     No. 17,744.

1. **Telephones: CONTRACT: CONSTRUCTION OF LINE.** Where a telephone company has obtained permission to build its line across the pasture of a landowner, under an agreement to maintain its telephone wire at a sufficient height to avoid the danger of injury

to persons and stock, it is the duty of the company and its grantor to comply with such agreement.

2. ———: CONSTRUCTION OF LINE. As a matter of law, a telephone company is required to maintain its line where it crosses the pasture of another at a sufficient height, and in such a condition as to prevent injury to persons and domestic animals.

3. ———: INJURY: EVIDENCE. The death of a person may be shown to have been caused by negligence on the part of a telephone company to properly construct and maintain its wires, by circumstantial evidence.

4. Instructions examined, and *held* not inconsistent, and to have been properly given.

APPEAL from the district court for Custer county: BRUNO O. HOSTETLER, Judge. *Affirmed.*

*J. R. Dean* and *Edgar M. Morsman, Jr.,* for appellant.

*Sullivan & Squires, contra.*

BARNES, J.

The plaintiff, as administrator of the estate of his deceased minor son, brought this action to recover for the death of his decedent alleged to have been caused by the negligence of the defendant in not properly maintaining its telephone wire where it crossed the plaintiff's pasture, about 20 miles from the city of Broken Bow, in Custer county, Nebraska. A trial to a jury in the district court for that county resulted in a verdict for the plaintiff for the sum of $1,750. Defendant's motion for a new trial was overruled, judgment was rendered on the verdict, and the defendant has appealed.

The record discloses that plaintiff was the lessee of the farm where the accident occurred; that in the year 1903 the defendant's grantor had constructed the telephone line in question across the pasture with the consent of the owner of the farm, without compensation, under an agreement with the owner that it would place its wires on poles sufficiently high to render it safe, and keep and maintain the line in that condition; that on or about the 31st day of August, 1911, the plaintiff's decedent, Willie F. Coen,

who was then about nine years of age, mounted the family horse and started, about sundown, to the pasture to bring in the cows; that in about 20 minutes thereafter plaintiff's daughter saw the horse standing in the corral without the bridle. Fearing that Willie had been hurt, she went to the pasture and found him in a draw about the center of the canyon, where he was lying on the ground on his right side, dead. Where he was found there was a great deal of blood on the ground. She testified that a short time before Willie started for the cattle she had talked with a neighbor by the name of Marsh over the telephone; that after she returned to the house with Willie's body she tried to use the line, but could not get any one. On cross-examination she testified that the horse rode by Willie was the old family horse; that it had been used for that purpose for more than eight years; that the horse was a quiet animal; that she never knew it to cut up in any way; that it could be driven both double and single; that it was used for farm work, and was the farm horse; that it had the saddle on when Willie left the corral; that when she found Willie he had his cap on, and the whip was lying by his side.

Mrs. Marsh was called as a witness for the plaintiff, and testified that she was at home all day the day that Willie Coen was killed; that she was talking with Minnie Coen and Mrs. Coen that afternoon; that she last talked to Minnie about sundown; that she was within hearing of her telephone all of the evening, and no one had called over the telephone after she talked with Minnie until the line was repaired.

Murl Coen, a witness for plaintiff, testified that he was 18 years old; that he was at Eddyville on the 31st day of August, 1911; that it was getting dark when he got home; that he saw his mother sitting on the porch holding his brother Willie on her lap; that in a few minutes he went to the point where the wire was broken, probably 15 or 20 minutes after he got home; that he found the wire broken in two, close to the southwest pole, about 200 yards from the house; the wire ran southwest and northeast,

and the poles were about 80 steps apart where the wire was broken; that he searched the ground and could not find the wire, so he went to the northeast pole, and found the pole torn down, or torn from the cedar post, and lying on the ground; that in order to find the wire he took hold of it where it was attached to the post and ran it back, pulling it to the end; that he finally discovered the end and pulled it back as he came up; that it seemed sort of down the hill, and the other end was wrapped around the pole or post; that the ground under the wire where it was stretched between the posts was generally level; from the point where the wire was broken down to the canyon was about 50 steps; that the posts were formed by what are called bed slats, which were boards nailed to cedar posts; that at the broken post both boards were on the ground; that he repaired the break in the wire, and raised the post; after he got back he could use the telephone; that they kept work horses and milch cows in the pasture; that the horses were not out the night Willie was killed, and there were no other horses in the pasture at that time.

Oscar Blevins was called for the plaintiff, and testified that on the night the boy was killed he was at the place where the accident occurred; that he examined the horse's tracks from the point where the boy was killed back to where the wire had been broken. The tracks got heavier as they went down the canyon. When they struck the ground they would cut the grass and throw up the dirt. The tracks were fresh, and were plainly discernible down the hill from where the wire was broken; that he followed the track in the morning from the deep edge of the canyon to the point where the mare came out, and up to where the boy was found on the side hill. The ground was cut up by what is called small cat steps. From the canyon to where the boy was found is about 35 yards; the total distance from where the horse passed through the wire to where the boy was found is about 300 yards. There was evidence that the mare had fallen; that she had struck the ground and made a saddle mark; that she scooted, and seemed to sort of struggle, or wheel; that he saw the bridle

95 Neb. 52

near where the boy was found, about 10 feet from the body; that the tracks showed that the horse had jumped in places about 18 feet.

Herman Campbell testified that he lived about a mile from Coen's, and was called to Coen's place on the evening of the 31st day of August, 1911, and found Mrs. Coen and her oldest daughter there. Mrs. Coen was on the front porch, holding the boy Willie, when he rode up to the house. When he went up to her she was talking about the boy; she was afraid he was killed; she said she could not wake him up, but she did not believe he was killed, if she could get a doctor. The girl took the horse and went across the river to Mrs. Woodruff's, and telephoned to Eddyville; that the boy was dead. Witness said he was there when the doctor made the examination; that the boy's face was badly bruised; that he examined the fracture of the skull, which was a little above and behind the ear; that the fracture seemed to be pretty well defined; that he went to the point where the boy was found, the next morning, with Mr. Blevins and two other men; that they walked along the telephone line; that he left the place where the boy had fallen, and went to the telephone line and followed the line to where it was broken; that there they struck a horse's track, and followed it from there back to where the boy lay; the ground under the telephone wire was fairly smooth and even; that they struck the track at or near the wire, and it angled off across the flat and down the bank to the bottom of the canyon, and followed the course of the canyon to where the old trail crossed between the corral and the point where the body was found. The tracks were well defined and showed that the horse had been running; they showed the horse had been awfully excited, and went without any regard whatever to the lay of the ground. The witness said: "I remember seeing places where the horse's feet had struck the edge of the cat steps, it would be caved off and the dirt pushed off or torn up." The horse "was in violent action; you could discern that." He said he had been along the wire before the accident occurred; that the wire was low;

in the spring he had crossed the hills in the pasture just west of the point where the wire was broken; that the wire was low enough to catch a man on horseback—was between five and seven feet from the ground; that he had had a good deal of experience in going about wire in the condition in which this one was; that it was extremely difficult to tell where the wire was with regard to the distance from you, or even see it; that one could very easily run into wire the right distance from the ground without seeing it, and a person was liable to do this in going about his work.

Several other witnesses were called who described the conditions substantially as testified to by the witnesses above named. The defendant produced no witnesses.

The first point made by the defendant in its brief is that there was no evidence from which the jury could infer that the telephone wire was the proximate cause of the accident, and there was no evidence upon which the jury could reasonably conclude that the horse was ridden into the wire, and thereby became unmanageable and ran away, or that the horse was running when it fell and threw the boy.

In answer to this contention, it may be said that 5 minutes before the boy went into the pasture, and within 15 minutes before he was killed, the wire was not broken, because it was being used to telephone from plaintiff's house to the neighbors, and as soon as the boy was found it was impossible to use it for telephone purposes. This fact is clearly shown by the testimony of Miss Coen and Mrs. Marsh. It also appears that the horse was cut in the flank; that the wound was such a one as the end of the wire would make. Her tracks showed rapid speed, and when she fell she slipped along the ground and pulled the bridle from her head. Therefore it was reasonable to infer that the mare was ridden into the wire; that it broke, and probably wrapped around her limbs and lacerated her body; she thereupon ran away with the boy down over the steep embankment until she fell and killed him. So it

cannot be said that there was no evidence to support the conclusion reached by the jury.

Appellant's second contention is that it was under no obligation to keep the telephone wire at any specified height above the ground. It was the duty of defendant to keep the wire through the pasture in a safe condition. This duty resulted, first, from the agreement between its grantor and Cavenee, the owner of the pasture. The testimony is undisputed that Cavenee gave oral license to the builder of the line through the pasture in consideration of a promise and agreement to keep the wire in safe condition, and by virtue of this agreement it was the duty of the defendant to keep and maintain the wire in such a condition that it would not be dangerous, and, allowing it to sag in the manner shown by the testimony, was a violation of the direct agreement of its grantor. Second, the law imposed upon the company the duty of so using its wire as not to injure others. Appellant was using the plaintiff's land without pay, and should therefore be held to the highest degree of care in the use of its property. The company was therefore bound to use more than ordinary care in the maintenance of its wire over and across the lands leased by the plaintiff.

In 29 Cyc. 424, under the title of "Negligence," it is said:

"The duty, violation of which constitutes negligence, may arise in several ways. It may be created by statute or ordinance, by contract, or from the relation of the parties, as in case of master and servant, bailor and bailee, carrier and passenger or consignee. This duty is usually implied by law, the rule being that the law imposes on a person engaged in the prosecution of any work an obligation to perform it in such a manner as not to endanger the lives or persons of others, and the law imposes on every person in the enjoyment of his property the duty of so using his own as not to injure his neighbor. This duty may also arise out of circumstances; and this is especially true where a person is using or dealing with a highly dangerous thing which, unless managed with the greatest

care, is calculated to cause injury to bystanders, where an owner has reason to apprehend danger owing to the peculiar situation of his property and its openness to accident, or where it was apparent that if a person did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger or injury to another."

It may therefore be said that by reason of its contract it was defendant's duty to maintain the wire in a safe condition. The law also imposes upon the company the duty of so using and maintaining its telephone wire as not to injure others.

Appellant's third contention is, that the accident could not have been foreseen or anticipated. It is within common knowledge of every one that persons handling stock are bound to go anywhere in the pasture where it is kept, and the agents and employees of the defendant must have known that parties using the pasture were likely to ride through it on horseback; that they were likely to go through the pasture in the nighttime as well as in the daytime. As said by the witness Campbell, it is difficult to tell the condition of a wire when riding up to it. The defendant's manager and agents must have been familiar with the character and habits of horses. We are therefore of opinion that this contention is without merit.

The fourth point made by appellant is that the instructions of the court were inconsistent and erroneous. In support of this contention it is said that by instructions 9 and 10 the jury were permitted to return a verdict based on circumstantial evidence; that by instruction No. 4, plaintiff was required to establish his cause by a preponderance of the evidence; and the instructions are erroneous because any fact cannot be established by a preponderance where the evidence is circumstantial. It requires no citations to refute this contention. The books are full of cases where judgments inflicting a death penalty have been sustained which were based alone on circumstantial evidence.

It is further contended that the court erred in giving instruction No. 5. By this instruction the jury were told, in substance, that the plaintiff must satisfy them by a preponderance of the evidence that he was the duly appointed and qualified administrator of the estate of William F. Coen, deceased; that William F. Coen, without fault on his part, or that of his parents, came to his death on account of his horse becoming entangled in the telephone wires of defendant, as alleged in the petition; and that the manner in which the defendant maintained its wire at the time was negligent; that such negligence was the direct and proximate cause of the death of said William F. Coen; and they should find those facts from the evidence, and further find that the parents sustained some damages because of William F. Coen's death, then they should find for the plaintiff.

Appellant criticises this instruction because it did not embody the idea that appellant should have had knowledge of the dangerous condition of the wire. It may be said that it was the duty of defendant to know the condition of its wire, and not to allow it to become sagged and in such a condition as would likely cause the injury complained of.

Again, it is apparent from the evidence that the wire in question had been in a dangerous condition for a long time before the accident occurred. The posts supporting the wire had been placed there in 1903, eight years before the accident. They were simply two boards one inch thick and four inches in width nailed onto short cedar posts, and on these bed slats (so-called) the wires were suspended. Therefore the defendant company was bound to know that the wires were likely to get out of position and become dangerous by reason of sagging.

Witness Campbell testified that he had been over the pasture early in the spring; that the wire was then low enough to catch a man on horseback. Again, about four weeks before the accident, plaintiff took defendant's agent, whose special duty it was to keep the line in repair, and pointed out to him the particular defect in the wire which

caused the accident in question, and insisted that a new post should be put in to hold up the wire. So the defective condition of the wire was known to the defendant for something like three or four weeks before the accident occurred.

Concerning the point made by appellant that negligence can never be said to be established by a preponderance of the testimony where the evidence is circumstantial, it may be said that the law does not require direct and positive evidence of negligence. That fact may be inferred from circumstances adduced in evidence, and, if the testimony is sufficient to satisfy reasonable minds of the fact of negligence, that is all that is required.

As we view the record, it contains no reversible error, and the judgment of the district court is therefore

AFFIRMED.

ROSE and SEDGWICK, JJ., not sitting.